IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| XENE INNOVATIONS, LLC,<br><br>                              Plaintiff,<br><br>          v.<br><br>THE BOEING COMPANY,<br><br>                              Defendant. | Case No. 1:25-cv-2066<br>_____<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR PATENT INFRINGEMENT

This is an action for patent infringement in which Plaintiff Xene Innovations, LLC ("Xene") makes the following allegations against Defendant The Boeing Company ("Boeing").

## BACKGROUND

1.      This patent-infringement action arises from Boeing's unauthorized use of Xene's patented method for manufacturing carbon-fiber composite parts—an innovative method that streamlines production and yields lighter, stronger, and more reliable components than traditional methods.

2.      For decades, manufacturers used inefficient "hand layup" methods to make foam-filled carbon-fiber composite parts.

3.      These methods involved wrapping prepregs—carbon fibers impregnated with a polymeric resin—around a preform, sealing the assembly, and curing it with heat and pressure.

4.      Manufacturers typically injected foam into the hollow core after forming the part or sandwiched the foam between layers of prepreg.

5.      While these approaches could produce hardened, foam-filled carbon-fiber parts, they were slow, inconsistent, and prone to quality-control issues.

6.      Inventor Jerry Choe, a self-trained engineer who studied at Duke and a Fordham-educated attorney, encountered these limitations firsthand. As the co-owner of Donnay, a tennis racket manufacturer, Mr. Choe sought to solve the problem of "tennis elbow," a condition caused by vibrations traveling through hollow carbon-fiber rackets.

7.      Mr. Choe accomplished this by filling the hollow carbon-fiber core with syntactic foam (that is, foam filled with tiny spheres), thus reducing strain and improving performance.

8.      Mr. Choe didn't stop at solving the problem—he reimagined the process itself. To manufacture his foam-filled rackets more efficiently, Mr. Choe developed a novel method that cures the carbon-fiber structure and fills it with syntactic foam in a single, integrated step.

9.      The method uses a rigid mold shaped like the final product. Uncured carbon-fiber composite is placed against the mold wall. Expandable microcapsules—tiny capsules containing a foaming agent—are positioned inside the mold next to the composite. When heated, the microcapsules expand, generating internal pressure that shapes and cures the carbon-fiber composite.

10.     The expanding microcapsules serve a dual purpose. They fill the interior with lightweight, honeycomb-shaped foam, while also pressing the carbon-fiber layers firmly against the mold. This pressure flattens and aligns the fibers, enhancing structural integrity and reducing the amount of material required. And, as a whole, the process produces lighter, stronger, and more reliable parts—produced with fewer steps and greater consistency than conventional methods.

11.     The method Mr. Choe developed, once a novel solution to a niche problem, has now been adopted across multiple industries.

12.     Today, manufacturers use this process to produce high-performance carbon-fiber parts used in wind turbines, high-speed trains, high-performance vehicles, and aircraft.

13.    Boeing is one such adopter. Its 787 Dreamliner—"the first commercial airliner made primarily with this new-age material"—relies on composite components manufactured using the very techniques pioneered by Mr. Choe. *See* Real Engineering, *How the Boeing 787 Works*, https://www.youtube.com/watch?v=z_PlyQAWT4g&t=76s [https://perma.cc/VA75-ZLD3] (1:28 – 1:45) (last visited November 7, 2025).

14.    Boeing itself acknowledged the origins of the patented method. In a marketing video, Boeing described the composite technology used in the 787 Dreamliner as "the kind of material commonly used in small consumer products, such as tennis rackets"—the very application where the patented method was first developed and commercialized. The video even shows a tennis racket being manufactured, underscoring Boeing's awareness of the technology's provenance.

Source: Boeing, *"The Dreamliner" – Boeing Age of Aerospace, Ep. 5*, https://www.youtube.com/watch?v=SLgbOhdmK1I [https://perma.cc/LN3R-A8CU] (12:24 – 12:44) (last visited November 7, 2025).



15.     Yet Boeing uses the patented technique without authorization or compensation to Xene, which owns all substantial rights to the patent-in-suit.

## PARTIES

16.     Plaintiff Xene is a Wyoming limited liability company with a principal place of business at 400 S. 4th Street, 3rd Floor, Las Vegas, NV 89101.

17.     On information and belief, Defendant Boeing is a Delaware corporation.

18.     Boeing maintains a regular and established place of business in this District at its principal place of business at 929 Long Bridge Drive, Arlington, VA 22202.

19.     Boeing may be served through its registered agent for service of process, Corporation Service Company, 100 Shockoe Slip Fl 2, Richmond, VA 23219.

## JURISDICTION AND VENUE

20.     This action arises under the patent laws of the United States, Title 35 of the United States Code.

21.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

22.     This Court has personal jurisdiction over Boeing because, directly or through intermediaries, it has committed acts within Virginia giving rise to this action and/or has established minimum contacts with Virginia such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice.

23.     Specifically, Boeing maintains a regular and established place of business in this District at its principal place of business at 929 Long Bridge Drive, Arlington, VA 22202.

24.     Indeed, Boeing's headquarters is located at this address in Arlington, Virginia in this District and the Alexandria Division.

25.      Further, during the infringing time period, Boeing has placed one or more products made by a process covered by the asserted patent into the stream of commerce via an established distribution channel with the knowledge and/or understanding that such products were being offered for sale, and/or sold to customers, and/or utilized in Virginia.

26.      For example, Boeing has sold and continues to sell the Boeing 787 Dreamliner for use in Virginia, including at Ronald Reagan Washington National Airport in Arlington, Virginia, and Washington Dulles International Airport in Dulles, Virginia.

27.      Unsurprisingly, Boeing has proclaimed that it has a "foundation here in Northern Virginia" and that its headquarters in Arlington, Virginia are "close to Boeing's global customers and stakeholders." **Exhibit E**[1]; *see* **Exhibit F**[2] (noting that Boeing calls "Virginia home").

28.      Because Boeing resides in this District, venue is proper pursuant to 28 U.S.C. § 1391(c).

29.      Venue is also proper in this District under 28 U.S.C. §§ 1391 and 1400(b).

30.      Boeing maintains a regular and established place of business in this District at its principal place of business at 929 Long Bridge Drive, Arlington, VA 22202, from which Boeing does business in this District, has committed acts of infringement in this District, and continues to commit acts of infringement in this District, entitling Xene to relief.

---

[1] Boeing, *Boeing Names Northern Virginia Office Its Global Headquarters; Establishes Research & Technology Hub*, https://boeing.mediaroom.com/2022-05-05-Boeing-Names-Northern-Virginia-Office-Its-Global-Headquarters-Establishes-Research-Technology-Hub [https://perma.cc/ZX3E-5J9D ] (last visited November 7, 2025).

[2] Governor of Virginia, *Governor Glenn Youngkin Statement on Boeing's Decision to Headquarter in Virginia*, https://www.governor.virginia.gov/newsroom/news-releases/2022/may/name-932058-en.html [https://perma.cc/7XTE-X3ZZ] (last visited November 7, 2025).

31.    Specifically, certain elements of the patent at issue contemplate "supplying thermally expandable foamable microcapsules," "supplying an uncured carbon or fiberglass composite," and "supplying a rigid constraining mold."

32.    On information and belief, Boeing directs, authorizes, and oversees procurement decisions relating to the "supplying" steps of the asserted patent from its headquarters in this District, which is the locus of Boeing's decision-making regarding material sourcing, supplier coordination, and logistical support for its commercial aircraft programs.

33.    Because those decisions govern what materials are procured and where they are distributed, acts taken from this headquarters constitute "supplying" within the meaning of the asserted claims.

34.    Boeing's own public job postings further indicate that supply-chain operations are carried out in this District. Boeing recently posted an opening for a paid "Supply Chain" position to be based in, among other possible locations, Fairfax and Arlington—both located in this District. That job posting strongly suggests that supply-chain functions, including those relevant to the patent at issue, are conducted, at least in part, from Boeing's Virginia headquarters.

35.    On information and belief, Boeing also provides direction and assistance from its Arlington headquarters to affiliates and facilities involved in carrying out the patented process.

36.    Through such coordination—including procurement, supplier engagement, and technical support—Boeing participates in and induces the "supplying" and related steps necessary to perform the patented method.

37.    Boeing also uses, offers to sell, or sells within this District aircraft made by a process covered by the asserted patent.

38.    For example, Boeing flew its 787 Dreamliner into Ronald Reagan Washington National Airport in Arlington, Virginia as part of its international "Dream Tour."

Source: Boeing, *Boeing 787 and Dream Tour Land in D.C.*, https://www.youtube.com/watch?v=fWzpw9x-jHw [https://perma.cc/YG9B-3NTR] (last visited November 7, 2025).



39.    This event was not merely ceremonial; it was a targeted marketing effort aimed at potential customers and stakeholders. **Exhibit G**.[3]

40.    Boeing's own press materials described the stop as "dramatic," "different," and a "treat," and noted the presence of numerous VIPs, including ambassadors, members of Congress, and then-Secretary of Transportation Ray LaHood. *See* Boeing, *Boeing 787 and Dream Tour Land in D.C.*, https://www.youtube.com/watch?v=fWzpw9x-jHw [https://perma.cc/YG9B-3NTR] (last visited November 7, 2025).

---

[3]    Boeing, *Boeing Announces Sixth Leg of 787 Dream Tour*, https://boeing.mediaroom.com/2012-04-11-Boeing-Announces-Sixth-Leg-of-787-Dream-Tour [https://perma.cc/NM5N-DB4V] (last visited November 7, 2025).

41.     During this marketing visit, Boeing's then-CEO Jim Albaugh publicly promoted the aircraft as "the first new airplane of the 21st Century," highlighting its "all composite" design—a feature central to the patented process at issue. *See id.* (1:46 – 2:02) (last visited November 7, 2025); *see also* Long Haul by Simple Flying, *From Start to Finish: How the Boeing 787 Is Made*, https://www.youtube.com/watch?v=CDC0Cd8DP-c [https://perma.cc/Y9MB-VEHD] (describing the "Dream Tour" as being part of an "ambitious global marketing tour") (3:11 – 3:26) (last visited November 7, 2025); Boeing, *Dream Tour Preview*, https://www.youtube.com/watch?v=IYWHPKBSbOc [https://perma.cc/8YX6-CRMG] (noting that the Dream Tour allowed "customers and media" to "get up close and personal with the airplane") (0:13 – 0:25) (last visited November 7, 2025); Boeing, *787 Dream Tour begins in Beijing*, https://www.youtube.com/watch?v=BgA5rdVJr1M [https://perma.cc/XRW8-583G] (stating that, during the Dream Tour, the 787 Dreamliner is "in a marketing configuration" and allowed Boeing to "talk to customers") (1:04 – 1:15) (last visited November 7, 2025).

## THE ASSERTED PATENT

42.     This lawsuit asserts a cause of action for infringement of U.S. Patent No. 11,806,584 (the "'584 Patent").

43.     On November 7, 2023, the United States Patent and Trademark Office (the "PTO") issued the '584 Patent, entitled "Fiber Composite And Process of Manufacture." A true and correct copy of the '584 Patent is attached as **Exhibit A**.

44.     The '584 Patent is a continuation of application No. 16/014,190, filed on June 21, 2018, which is a continuation of application No. 13/667,963, filed on November 2, 2012, now Patent No. 10,500,447 (the "'447 Patent"), which is a continuation of application No. 12/964,690,

filed on December 9, 2010, now Patent No. 8,328,666. The '584 Patent also claims priority to a provisional application, No. 61/285,061, which was filed on December 9, 2009.

45.    Jerry Choe, the CEO and President of Non-Party Xene Corporation, and Hsu Chien Sheng are the co-inventors of the '584 Patent.

46.    Non-Party Xene Corporation has assigned all substantial rights to the '584 Patent to Xene.

47.    The '584 Patent claims a method for manufacturing shaped carbon-fiber composite parts using expandable microcapsules to generate internal pressure during curing, which flattens and aligns the carbon-fiber layers against the mold, yielding a stronger, lighter, and more reliable part.

48.    The '584 Patent directly addresses the shortcomings of conventional "hand layup" techniques.

49.    Under the old approach, manufacturers wrapped prepreg around a preform, sealed the assembly in a vacuum bag or autoclave, and injected or sandwiched foam after the fact.

50.    These steps were labor-intensive, inconsistent, and prone to structural defects.

51.    By contrast, the method claimed in the '584 Patent supplants the manual, hollow-tube approach with a streamlined process.

52.    A rigid mold is used to shape the part. Uncured carbon-fiber composite is placed against the mold wall, and expandable microcapsules—tiny capsules containing a foaming agent—are positioned adjacent to the composite.

53.    When heated, the microcapsules expand, forming syntactic foam while simultaneously exerting pressure that presses the composite into the mold as the resin cures. In this way, the foam is no longer a post-process filler but the very mechanism by which the composite

is shaped and strengthened. The following image from the '584 Patent (Figures 9a and 9b) illustrates this method, showing the microcapsules expanding to shape and reinforcing the composite carbon fiber. *See* **Exhibit A at Sheet 7**.



54.    The result is a solid composite part that is structurally superior, easier to produce, and more consistent than parts made with legacy methods.

55.    Although first developed to improve tennis racket performance, the patented method has broad industrial utility and today finds application across fields ranging from sporting goods to aerospace.

## DEFENDANT'S ACCUSED PRODUCTS

56.    Boeing's infringing products (the "Accused Products") include the Boeing 787 Dreamliner (including the Boeing 787-9), the Boeing 777X, and any similar products made using the patented process.

57.    The Accused Products use Xene's patented technology without a license to do so.

## COUNT 1 – INFRINGEMENT OF U.S. PATENT NO. 11,806,584 UNDER 35 U.S.C. § 271(a)

58.    Xene repeats and incorporates by reference each preceding paragraph as if fully set forth herein, and further states:

59.    Under 35 U.S.C. § 271(a), "[w]hoever without authority makes, uses, offers to sell, or sells any patented invention . . . infringes the patent."

60.    On November 7, 2023, the PTO issued the '584 Patent, entitled "Fiber Composite And Process of Manufacture."

61.    On October 8, 2025, Xene Corporation assigned all substantial rights to the '584 Patent, including all divisionals, renewals, and continuations thereof, to Xene such that Xene is the owner of all rights, title, and interest in and to the '584 Patent, including the right to assert all causes of action arising under the '584 Patent and the right to any remedies for the past, current, and future infringement of the '584 Patent.

62.    Boeing is not licensed under the '584 Patent, either expressly or implicitly, nor does it enjoy or benefit from any rights in or to the '584 Patent whatsoever.

63.    Boeing has directly infringed, and continues to directly infringe, at least Claim 11 of the '584 Patent in violation of 35 U.S.C. § 271, either literally or through the doctrine of equivalents, by making, using, selling, or offering for sale in the United States, and/or importing into the United States without authorization, one or more products that practice at least Claim 11

of the '584 Patent (hereinafter the "'584 Accused Products"). This includes products like the Boeing 787 Dreamliner (including the Boeing 787-9), the Boeing 777X, as well as any similar products. Boeing is thus liable for its infringement of the '584 Patent pursuant to 35 U.S.C. § 271(a), (b), (c), and (g).

64.    As detailed below, Boeing manufactures the '584 Accused Products pursuant to a method that practices every element of at least Claim 11 of the '584 Patent literally or under the doctrine of equivalents.[4] Further, the identified components and functionality are representative of the components and functionality present in all '584 Accused Products.

65.    Claim 11 of the '584 Patent recites:

A method of manufacturing a shaped fiber composite part, comprising:

supplying thermally expandable foamable microcapsules, said microcapsules encapsulating a foaming agent;

supplying an uncured carbon or fiberglass composite having a curing temperature;

supplying a rigid constraining mold;

placing said uncured carbon or fiberglass composite against a wall of said constraining mold;

adding said foamable microcapsules to an internal volume of said constraining mold proximate to said uncured carbon or fiberglass composite, said foamable microcapsules being configured to undergo volumetric expansion by foaming only when heated to a predetermined first temperature;

closing said constraining mold to create a sealed pressure vessel;

causing a plurality of said foamable microcapsules to expand by heating said foamable microcapsules to above or at the predetermined first temperature so that a volumetric expansion by foaming of the foamable microcapsules creates a resulting pressure

---

[4] This description is illustrative and is not intended to be an exhaustive or limiting explanation of every manner in which each '584 Accused Product infringes the '584 Patent.

inside said sealed pressure vessel to said carbon or fiberglass composite; and

allowing said carbon or fiberglass composite to cure at a second temperature that is at least equal to said predetermined first temperature, and while said resulting pressure is being applied to said carbon or fiberglass composite.

66. The '584 Accused Products satisfy all claim limitations of one or more of the claims of the '584 Patent, including at least Claim 11.

*'584 Patent – Claim 11 Preamble*

67. The '584 Accused Products utilize a method of manufacturing a shaped carbon-fiber composite part.

68. Boeing itself advertises that composite carbon-fiber "materials make up 50 percent of the primary structure of the 787 Dreamliner, including the fuselage and wing, helping to make the Dreamliner 20 percent more fuel efficient than the airplane it replaces." **Exhibit H**.[5]



69. This extensive reliance on carbon-fiber composites earned the 787 Dreamliner the moniker "Plastic Princess."

---

[5]    Boeing, *Carbon Fiber for the 787 Dreamliner*, https://secure.boeingimages.com/archive/Carbon-Fiber-for-the-787-Boeing-Dreamliner-2JRSXLJ8KMLX.html [https://perma.cc/4CRF-BVWR] (last visited November 7, 2025).

70.    Boeing touts these composites as "lighter and robust," yielding improved fuel efficiency, durability, and comfort—many of the same benefits identified in the '584 Patent. **Exhibit I**.[6]



# 787 Dreamliner family

## The bestselling passenger widebody of all time

In less than 14 years, the 787 Dreamliner fleet has carried more than one billion passengers, faster than any other widebody jet in aviation history. The airplane's industry-leading technology creates remarkable opportunities for airlines around the world and dramatically improves the air travel experience. A lighter and robust composite structure enables airlines to reduce fuel use by up to 25 percent compared to the airplanes it replaces. The 787 has unlocked more than 425 new nonstop routes around the world, many of which were never served previously.

On nearly 5 million flights, passengers have an experience like none other in the air. Innovative interiors provide spacious cabins, better views with the largest windows available on any widebody commercial jet today, and cabin enhancements that allow passengers to arrive to their destinations feeling more refreshed.

71.    Specifically, using carbon-fiber composites, Boeing manufactures the fuselage as "one massive part" that "eliminate[s] all joints and all the fasteners." *See* Real Engineering, *How the Boeing 787 Works*, https://www.youtube.com/watch?v=z_PlyQAWT4g&t=76s [https://perma.cc/VA75-ZLD3] (6:36 – 6:50) (last visited November 7, 2025).

72.    The result is an "incredibly aerodynamic" structure without "thousands of little bumps and ridges"; its stronger build permits cabin pressure "equivalent of 6,000 ft . . . about 7.3% higher in pressure"; and the carbon-fiber wings "can bend . . . super flexible during flight." *Id.* (4:44 – 5:20, 7:12 – 7:22, 9:16 – 9:31).

73.    Together, these advancements make flights more comfortable, less fatiguing, and more stable.

---

[6] Boeing, *787 Dreamliner family – The bestselling passenger widebody of all time*, https://www.boeing.com/commercial/787#overview [https://perma.cc/4ZPB-2B9F] (last visited November 7, 2025).

74.     Boeing has leveraged these composite-driven improvements to retain old customers and attract new ones to purchase the $250-million-plus 787 Dreamliner. **Exhibit J**.[7]

75.     As one industry analysis explains, the 787 consumes "20% less fuel than comparable planes—a huge potential savings considering jet fuel is an airline's biggest expense." *See* Aviation Crazy, *Engineering the Boeing 787 Dreamliner Documentary*, https://www.youtube.com/watch?v=M2JZVhTFxac [https://perma.cc/KR94-YDAL] (4:55 – 5:27) (last visited November 7, 2025).

76.     That savings helps justify the enormous cost of the 787 Dreamliner to Boeing's customers.

77.     Boeing continues to implement the same composite-manufacturing methods in its next generation of aircraft. Boeing's new 777X "will be the world's largest and most efficient twin-engine jet," due in part to "innovations from the 787 Dreamliner." **Exhibit K**.[8]

78.     Boeing's own patent filings confirm that its 787 Dreamliner utilizes a method of manufacturing a shaped carbon-fiber composite part.

79.     On May 10, 2022, the PTO issued U.S. Patent No. 11,325,282 (the "'282 Patent"), entitled "Method of Manufacturing a Composite Workpiece," to Boeing. **Exhibit B**.

80.     This patent claims priority to an application filed on August 2, 2018—nearly a decade after the '584 Patent's priority date.

---

[7] Simple Flying, *Money Talks: A Look At The List Prices of Boeing Aircraft*, https://simpleflying.com/how-much-do-boeing-aircraft-cost/    [https://perma.cc/2CFZ-ZRFW] (last visited November 7, 2025).
[8] Boeing, *Boeing 777X*, https://www.boeing.com/commercial/777x [https://perma.cc/B6EL-J9SD] (last visited November 7, 2025).

81.    In the '282 Patent, Boeing claimed exclusive rights over "[a] method of manufacturing a composite workpiece," *id.* at Column 33, language that closely tracks Claim 11 of the '584 Patent.

82.    On April 12, 2022, the PTO issued U.S. Patent No. 11,298,892 (the "'892 Patent"), entitled "Expandable Tooling Systems and Methods," to Boeing. **Exhibit C**.

83.    This patent claims priority to an application filed on August 2, 2018—nearly a decade after the '584 Patent's priority date.

84.    In the '892 Patent, Boeing claimed exclusive rights over "[a] method of manufacturing a composite workpiece," *id.* at Column 29, language that again closely tracks Claim 11 of the '584 Patent.

85.    The '282 Patent and the '892 Patent incorporate by reference U.S. Patent No. 11,046,027 (the "'027 Patent"), issued by the PTO on June 29, 2021, entitled "Expandable Tooling Systems and Methods," to Boeing. **Exhibit D**.

86.    In the '027 Patent, Boeing claimed exclusive rights over "[a] method of manufacturing a first composite workpiece," *id.* at Column 34, language that again closely tracks Claim 11 of the '584 Patent.

87.    On information and belief, Boeing uses the '282 Patent, the '892 Patent, and the '027 Patent to manufacture carbon-fiber composite parts for the '584 Accused Products.

88.    Boeing's decision to secure patents that track the patent-at-issue reflects the significance of these methods to its most advanced aircraft.

*'584 Patent – Claim 11 Element (a)*

89.    The '584 Accused Products utilize a method of supplying thermally expandable foamable microcapsules, said microcapsules encapsulating a foaming agent.

90.    In the '282 Patent, Boeing claimed exclusive rights over a method of manufacturing a composite workpiece comprising "positioning a heat-generating element and a plurality of thermally expandable pellets proximate to an uncured composite workpiece, the heat-generating element being capable of undergoing an exothermic chemical reaction or an exothermic physical reaction when triggered, the plurality of thermally expandable pellets being configured to soften and undergo volumetric expansion by foaming when heated to a predetermined first temperature." **Exhibit B** at Column 33.

91.    Once again, that language closely tracks Claim 11 of the '584 Patent.

92.    And it's not just the language that mirrors Claim 11 of the '584 Patent. The '282 Patent contains an illustration depicting the "expandable pellets"—that is, expandable foamable microcapsules—expanding when heated, just like in the '584 Patent.[9] *See id.* at Sheet 8.

---

[9] *Compare with* **Exhibit A** at Sheet 7.



FIG. 16

FIG. 17

93.     In the '892 Patent, Boeing claimed exclusive rights over a method of manufacturing a composite workpiece comprising "adding foamable pellets to an internal volume of a constraining container proximate to an uncured composite workpiece supported on a rigid form, the foamable pellets being configured to expand when a predetermined change is produced in an attribute of the foamable pellets." **Exhibit C** at Column 29.

94.     Once again, that language closely tracks Claim 11 of the '584 Patent.

95.     And it's not just the language that mirrors Claim 11 of the '584 Patent. The '892 Patent contains an illustration depicting the "foamable pellets"—that is, expandable foamable microcapsules—expanding when heated, just like in the '584 Patent.[10] *See id.* at Sheet 6.

---

[10] *Compare with* **Exhibit A** at Sheet 7.



FIG. 12

FIG. 13

96.    In the '027 Patent, Boeing claimed exclusive rights over "inserting a plurality of unexpanded pellets into a cavity of an uncured composite workpiece assembly including at least the first composite workpiece, the plurality of unexpanded pellets being configured to expand when a predetermined change is produced in an attribute of the plurality of unexpanded pellets" and then "expanding the plurality of unexpanded pellets in the cavity by producing the predetermined change in the attribute of the plurality of unexpanded pellets." **Exhibit D** at Column 33.

97.    Once again, that language closely tracks Claim 11 of the '584 Patent.

98.    And it's not just the language that mirrors Claim 11 of the '584 Patent. The '027

Patent contains an illustration depicting the "unexpanded pellets"—that is, expandable foamable

microcapsules—expanding when heated, just like in the '584 Patent.[11] *See id.* at Sheet 9.



99.    On information and belief, Boeing uses the '282 Patent, the '892 Patent, and the

'027 Patent to manufacture carbon-fiber composite parts for the '584 Accused Products.

100.    Boeing's decision to secure patents that track the patent-at-issue reflects the

significance of these methods to its most advanced aircraft.

<u>*'584 Patent – Claim 11 Element (b)*</u>

101.    The '584 Accused Products utilize a method of supplying an uncured carbon or

fiberglass composite having a curing temperature.

---

[11] *Compare with* **Exhibit A** at Sheet 7.

102.    In publicly available "fact sheets," Boeing states that it uses "uncured carbon fiber" in the manufacturing process for the '584 Accused Products. **Exhibit L**;[12] *see also* **Exhibit M**[13] (noting that Boeing recycles "uncured carbon composites from its 777X wing manufacturing facility and Dreamliner production lines").

103.    These uncured composites have a curing temperature, which Boeing meets by placing them in a large autoclave—in simple terms, an industrial oven. *See* Boeing, *"The Dreamliner" – Boeing Age of Aerospace, Ep. 5,* https://www.youtube.com/watch?v=SLgbOhdmK1I [https://perma.cc/LN3R-A8CU] (15:50 – 16:01) (last visited November 7, 2025).

104.    Likewise, in the '282 Patent, Boeing claimed exclusive rights over a method of manufacturing a composite workpiece that used "an uncured composite workpiece." **Exhibit B** at Column 30.

105.    In the '892 Patent, Boeing claimed exclusive rights over a method of manufacturing a composite workpiece that used "an uncured composite workpiece." **Exhibit C** at Column 29.

106.    And in the '027 Patent, Boeing claimed exclusive rights over a method of manufacturing a first composite workpiece that used "an uncured composite workpiece assembly." **Exhibit D** at Column 33.

---

[12]    Boeing, *Airplane and Carbon Fiber Recycling,* https://www.boeing.com/content/dam/boeing/boeingdotcom/principles/esg/sustainability/fact-sheet-airplane-composite-recycling_06-2020.pdf [https://perma.cc/K688-DUMG] (last visited November 7, 2025).
[13] Simple Flying, *Side Panels and Laptops: How Boeing Uses Recycled Carbon Fiber,* https://simpleflying.com/side-panels-and-laptops-how-boeing-uses-recycled-carbon-fiber/ [https://perma.cc/QY2F-BRSM] (last visited November 7, 2025).

107.    Each of these Boeing patents thus parallels element (b) of Claim 11 of the '584 Patent by expressly reciting the use of an uncured composite workpiece, just as Boeing's own public disclosures confirm is used in manufacturing the '584 Accused Products.

108.    On information and belief, Boeing uses the '282 Patent, the '892 Patent, and the '027 Patent to manufacture carbon-fiber composite parts for the '584 Accused Products.

109.    Boeing's decision to secure patents that track the patent-at-issue reflects the significance of these methods to its most advanced aircraft.

*'584 Patent – Claim 11 Element (c)*

110.    The '584 Accused Products utilize a method of supplying a rigid constraining mold.

111.    For example, Boeing uses this process when manufacturing the fuselage of the 787 Dreamliner, wrapping "a carbon fiber tape impregnated with a plastic resin around a rotating mold of the fuselage," as illustrated below.

Source: Real Engineering, *How the Boeing 787 Works*, https://www.youtube.com/watch?v=z_PIyQAWT4g&t=76s  [https://perma.cc/VA75-ZLD3] 3:34 – 4:08) (last visited November 7, 2025).



112.    Boeing and its executives have acknowledged the use of rigid mold in manufacturing the '584 Accused Products.

113.    Walt Gillette, Boeing's then-VP of engineering, manufacturing, and partner alignment, stated that Boeing uses "tools that serve[] as the mold" to manufacture the 787 Dreamliner. **Exhibit N**.[14]

114.    Boeing's marketing materials reinforce this, describing the 787 Dreamliner as being manufactured with a "computerized lay-down of composite tape on a huge mold," as illustrated below. **Exhibit O**.[15]

---

[14]    Plastics Today, *Composites take off in new Dreamliner*, https://www.plasticstoday.com/materials/composites-take-off-in-new-dreamliner [https://perma.cc/RPF6-QCLK] (last visited November 7, 2025).

[15]    Boeing, *First 787 Composite Fuselage Section*, https://secure.boeingimages.com/archive/First-787-Composite-Fuselage-Section-2F3XC5QEBM1.html [https://perma.cc/39PC-MGTD] (last visited November 7, 2025).



**First 787 Composite Fuselage Section**

In January 2005, Boeing completed the first full-scale composite one-piece fuselage section for its 787 Dreamliner program, demonstrating concepts for 787 production that began in 2006. The structure, 22-feet (7-meters) long and nearly 19-feet (6-meters) wide, was the 787's first major development piece. The barrel section was built in December 2004, after several months of development work. Building the piece, which included stringers, started with computerized lay-down of composite tape on a huge mold. That mold was mounted on a tool that rotated the barrel as the tape was applied. The structure was then wrapped and placed in Boeing's autoclave for curing. The final step was unwrapping, inspection and tool removal. The team subsequently cut out windows and doors, and tested a painting process. It also ran numerous tests to verify structural integrity. The development team built seven more development pieces, representing different sections of the airplane, throughout 2005.

Conceptually Similar

115.    The use of rigid molds is not limited to the 787 Dreamliner.

116.    Boeing also employs molds in the production of the 777X. For example, Boeing uses at least "four individual molds . . . to manufacture the 777X's composite wing skins." **Exhibit P**.[16]

117.    Likewise, in the '282 Patent, Boeing claimed exclusive rights over a method of manufacturing a composite workpiece that involved "constraining a volume around the uncured composite workpiece." **Exhibit B** at Column 33.

118.    In the '892 Patent, Boeing claimed exclusive rights over a method of manufacturing a composite workpiece that used "an uncured composite workpiece supported on a rigid form." **Exhibit C** at Column 29.

---

[16] Composites Manufacturing, *Ascent Aerospace to Manufacture Largest Wing Skin Molds Ever*, https://acmanet.org/ascent-aerospace-to-manufacture-largest-wing-skin-molds-ever/ [https://perma.cc/8TRP-7J2D] (last visited November 7, 2025).

119.    And in the '027 Patent, Boeing claimed exclusive rights over a method of manufacturing a first composite workpiece that positioned "the uncured composite workpiece assembly within a mold." **Exhibit D** at Column 33.

120.    Each of these Boeing patents thus parallels element (c) of Claim 11 of the '584 Patent by requiring that an uncured composite be shaped or supported by a rigid mold or constraining form—the same tooling that Boeing publicly acknowledges using in manufacturing the Boeing 787 Dreamliner and other aircraft.

121.    On information and belief, Boeing uses the '282 Patent, the '892 Patent, and the '027 Patent to manufacture carbon-fiber composite parts for the '584 Accused Products.

122.    Boeing's decision to secure patents that track the patent-at-issue reflects the significance of these methods to its most advanced aircraft.

<u>'584 Patent – Claim 11 Element (d)</u>

123.    The '584 Accused Products utilize a method of placing said uncured carbon or fiberglass composite against a wall of said constraining mold.

124.    As discussed above, in manufacturing the fuselage of the 787 Dreamliner, Boeing wraps "a carbon fiber tape impregnated with a plastic resin around a rotating mold of the fuselage." *See* Real Engineering, *How the Boeing 787 Works*, https://www.youtube.com/watch?v=z_PlyQAWT4g&t=76s [https://perma.cc/VA75-ZLD3] (3:34 – 4:08) (last visited November 7, 2025).

125.    Boeing's marketing materials reinforce this, describing the 787 Dreamliner as being manufactured with a "computerized lay-down of composite tape on a huge mold." **Exhibit O**;[17]

---

[17]    Boeing, *First 787 Composite Fuselage Section*, https://secure.boeingimages.com/archive/First-787-Composite-Fuselage-Section-2F3XC5QEBM1.html [https://perma.cc/39PC-MGTD] (last visited November 7, 2025).

*see also* **Exhibit N**[18] (noting that the 787 Dreamliner's fuselage "started with computerized lay-down of composite tape on a huge mold. That mold was mounted on a tool that rotated the barrel as the tape was applied.").

126.    Likewise, in the '282 Patent, Boeing claimed exclusive rights over a method of manufacturing a composite workpiece "wherein constraining is performed using a constraining container." **Exhibit B** at Column 34.

127.    In the '892 Patent, Boeing claimed exclusive rights over a method of manufacturing a composite workpiece using "a constraining container proximate to an uncured composite workpiece supported on a rigid form." **Exhibit C** at Column 29.

128.    And in the '027 Patent, Boeing claimed exclusive rights over a method of manufacturing a first composite workpiece that positioned "the uncured composite workpiece assembly within a mold such that an outer surface of the workpiece assembly is placed against the mold." **Exhibit D** at Column 33.

129.    Each of these Boeing patents thus parallels element (d) of Claim 11 of the '584 Patent by requiring that the uncured composite be placed directly against a wall of the constraining mold—precisely the same method Boeing publicly acknowledges employing with the 787 Dreamliner fuselage structures.

130.    On information and belief, Boeing uses the '282 Patent, the '892 Patent, and the '027 Patent to manufacture carbon-fiber composite parts for the '584 Accused Products.

131.    Boeing's decision to secure patents that track the patent-at-issue reflects the significance of these methods to its most advanced aircraft.

---

[18]    Plastics    Today,    *Composites    take    off    in    new    Dreamliner*, https://www.plasticstoday.com/materials/composites-take-off-in-new-dreamliner [https://perma.cc/RPF6-QCLK] (last visited November 7, 2025).

*'584 Patent – Claim 11 Element (e)*

132.     The '584 Accused Products utilize a method of adding foamable microcapsules to an internal volume of said constraining mold proximate to said uncured carbon or fiberglass composite, said foamable microcapsules being configured to undergo volumetric expansion by foaming only when heated to a predetermined first temperature.

133.     Nina Gerber, a Boeing 787 Research and Technology Senior Manager at Boeing's South Carolina facility (where the Boeing 787 is manufactured), described Boeing's use of an elastomer tool called a "bladder" that provides "pressure along the inside of a part so that you have a consolidated, compact laminate." *See* It's a Material World Podcast, *Composite Materials in Boeing Airplanes – Ep. 35*, https://www.youtube.com/watch?v=sHamN9BBxJU [https://perma.cc/L2NY-Y7FA] (49:18 – 49:40) (last visited November 7, 2025).

134.     Using such a bladder prevents internal cavities from "collaps[ing] under autoclave pressure." **Exhibit Q** at 27.[19]

135.     That bladder is the "internal volume of said constraining mold" contemplated in element (e) of Claim 11 of the '584 Patent.

136.     On information and belief, it is not practically feasible to rely on a bladder alone to achieve the required pressure in large, complex composite parts such as those used in Boeing's aircraft.

137.     Instead, an internal expansion mechanism—such as foamable microcapsules—is necessary to provide sufficient and uniform pressure throughout.

---

[19]     Boeing, *Innovation Quarterly*, https://www.boeing.com/content/dam/boeing/boeingdotcom/features/innovation-quarterly/archive/IQ_2019_February_Winter_FINAL.pdf [https://perma.cc/V8D4-66NA] (last visited November 7, 2025).

138.    The term "bladder"—as used in the '584 Patent—also appears in Boeing's claim language, including at least the '027 Patent, which expressly recites a "resilient bladder" as part of the claimed method.

139.    Upon information and belief, the only reasonable conclusion from Boeing's use of a bladder is that it is practicing the '584 Patent that requires a bladder.

140.    Likewise, in the '282 Patent, Boeing claimed exclusive rights over a method of manufacturing a composite workpiece and "triggering the heat-generating element to produce the exothermic chemical reaction or the exothermic physical reaction so that a temperature of the uncured composite workpiece and the plurality of thermally expandable pellets is raised to at least the predetermined firs temperature." **Exhibit B** at Column 33.

141.    The '282 Patent mentions the term "bladder" nearly forty times, including that the bladder can be "at least partially filled with a foaming agent configured to expand when heated or release a quantity of gas having sufficient pressure and/or volume to apply a predetermined pressure to inner surfaces of constraining container." *Id.* at Column 26.

142.    In the '892 Patent, Boeing claimed exclusive rights over a method of manufacturing a composite workpiece that added "foamable pellets to an internal volume of a constraining container proximate to an uncured composite workpiece supported on a rigid form" where the foamable pellets "are configured to expand when a temperature of the thermally-activated foamable pellets is raised to at least a predetermined temperature." **Exhibit C** at Column 29.

143.    The '892 Patent also mentions the term "bladder" nearly forty times, including that the bladder "can alternatively or additionally be at least partially filled with a foaming agent configured to expand when heated or release a quantity of gas having sufficient pressure and/or

volume to apply a predetermined pressure to inner surface of constraining container." *Id.* at Column 19.

144.    And in the '027 Patent, Boeing claimed exclusive rights over a method of manufacturing a first composite workpiece that inserted "a plurality of unexpanded pellets into a cavity of an uncured composite workpiece assembly . . . the plurality of unexpanded pellets being configured to expand when a predetermined change is produced in an attribute," such as a change in "temperature of the plurality of unexpanded pellets according to a predetermined temperature-time profile." **Exhibit D** at Column 33.

145.    The '027 Patent also mentions the term "bladder" nearly forty times, including that the bladder "can be at least partially filled with a foaming agent configured to expand when heated or release a quantity of gas having sufficient pressure and/or volume to apply a predetermined pressure to inner surface of cavity." *Id.* at Column 13.

146.    Each of these Boeing patents thus parallels element (e) of Claim 11 of the '584 Patent by placing foamable or expandable pellets proximate to uncured composite in a mold cavity, and configuring volumetric expansion to when they are heated to a predetermined temperature.

147.    On information and belief, Boeing uses the '282 Patent, the '892 Patent, and the '027 Patent to manufacture carbon-fiber composite parts for the '584 Accused Products.

148.    Boeing's decision to secure patents that track the patent-at-issue reflects the significance of these methods to its most advanced aircraft.

### '584 Patent – Claim 11 Element (f)

149.    The '584 Accused Products utilize a method of closing said constraining mold to create a sealed pressure vessel.

150.    As discussed above, Boeing's own 787 engineers have publicly acknowledged that Boeing manufactures its aircraft using an elastomer "bladder" that provides "pressure along the inside of a part so that you have a consolidated, compact laminate." *See* It's a Material World Podcast, *Composite    Materials    in    Boeing    Airplanes    –    Ep.    35*, https://www.youtube.com/watch?v=sHamN9BBxJU    [https://perma.cc/L2NY-Y7FA]    (49:18    – 49:40) (last visited November 7, 2025).

151.    Sustaining the internal pressure requires the constraining mold to be closed and sealed; otherwise, the pressure would escape.

152.    Likewise, in the '282 Patent, Boeing claimed exclusive rights over a method of manufacturing a composite workpiece wherein "constraining is performed using a constraining container, and wherein thermally expandable pellets . . . are in direct contact with a wall of the constraining container." **Exhibit B** at Column 34.

153.    The specification makes explicit that this constraining container "is configured so as to be capable of being sealed, and to withstand internal pressure." *Id.* at Column 15.

154.    In the '892 Patent, Boeing claimed exclusive rights over a method of manufacturing a composite workpiece that added "foamable pellets to an internal volume of a constraining container proximate to an uncured composite workpiece supported on a rigid form" where the foamable pellets "are configured to expand when a temperature of the thermally-activated foamable pellets is raised to at least a predetermined temperature." **Exhibit C** at Column 29.

155.    The specification makes explicit that this constraining "container is sealed and the workpiece cured." *Id.* at Column 20; *see also id.* at Column 9 ("Any type of sealable opening is an appropriate opening, provided that when it is sealed, the container can withstand the pressure generated within the container."); *id.* at Column 23–24 (contemplating adding "reagent solution

containing the additional component to volume of container, either before or after the container is sealed").

156.     And in the '027 Patent, Boeing claimed exclusive rights over a method of manufacturing a first composite workpiece "wherein the cavity has an opening on a cavity face, the method further comprising retaining the plurality of unexpanded pellets within the cavity during expanding the plurality of unexpanded pellets by closing the opening." **Exhibit D** at Column 34.

157.     Each of these Boeing patents thus parallels element (f) of Claim 11 of the '584 Patent by closing the constraining mold to create a sealed pressure vessel.

158.     On information and belief, Boeing uses the '282 Patent, the '892 Patent, and the '027 Patent to manufacture carbon-fiber composite parts for the '584 Accused Products.

159.     Boeing's decision to secure patents that track the patent-at-issue reflects the significance of these methods to its most advanced aircraft.

<u>*'584 Patent – Claim 11 Element (g)*</u>

160.     The '584 Accused Products utilize a method of causing a plurality of foamable microcapsules to expand by heating said foamable microcapsules to above or at the predetermined first temperature so that a volumetric expansion by foaming of the foamable microcapsules creates a resulting pressure inside a sealed pressure vessel to said carbon or fiberglass composite.

161.     Publicly available marketing materials addressing the 787 Dreamliner confirm that large sections such as the "wing or a fuselage" are "transferred into a massive, sealed chamber called an autoclave, where they are hardened under heat and pressure." *See* Boeing, *"The Dreamliner"* – *Boeing* *Age* *of* *Aerospace,* *Ep.* *5,*

31

https://www.youtube.com/watch?v=SLgbOhdmK1I    [https://perma.cc/LN3R-A8CU]    (15:04 –
16:01) (last visited November 7, 2025).

162.    As discussed above, a bladder tool alone cannot provide the uniform internal
pressure required for such large, complex composite structures.

163.    On information and belief, Boeing achieves and maintains the necessary pressure
to cure carbon-fiber composite parts of that size by employing foamable microcapsules during the
manufacturing process.

164.    Indeed, Boeing itself emphasizes the use of its "supply chain to pay for some of the
engineering." *Id*. (14:20 – 14:31).

165.    That supply chain includes providers of "suitable microspheres . . . under the
proprietary name EXPANCEL"—foamable microcapsules that expand when heated. **Exhibit C** at
Column 13.

166.    Likewise, in the '282 Patent, Boeing claimed exclusive rights over a method of
manufacturing a composite workpiece comprising "triggering the heat-generating element to
produce the exothermic chemical reaction or the exothermic physical reaction so that a temperature
of the uncured composite workpiece and the plurality of thermally expandable pellets is raised to
at least the predetermined first temperature, and so that the plurality of thermally expandable
pellets undergoes the volumetric expansion by foaming to apply at least a predetermined pressure
to the composite workpiece." **Exhibit B** at Column 33.

167.    In the '892 Patent, Boeing claimed exclusive rights over a method of manufacturing
a composite workpiece comprising "expanding the foamable pellets by producing the
predetermined change in the attribute of the foamable pellets, so that an expansion of the foamable
pellets applies a resulting pressure to the workpiece supported on the rigid form within the internal

volume," with the pellets heated "to at least the predetermined temperature within the internal volume of said constraining container" and producing a predetermined pressure. **Exhibit** C at Column 29.

168.   The specification identifies the foamable pellets as "suitable microspheres . . . under the proprietary name EXPANCEL." *Id.* at Column 13.

169.   And in the '027 Patent, Boeing claimed exclusive rights over a method of manufacturing a first composite workpiece "wherein the attribute of the plurality of unexpanded pellets is a temperature of the plurality of unexpanded pellets, and wherein producing the predetermined change in the attribute of the plurality of unexpanded pellets includes heating the plurality of unexpanded pellets to at least a predetermined first temperature." **Exhibit** D at Column 33.

170.   Each of these Boeing patents thus parallels element (g) of Claim 11 of the '584 Patent by heating foamable microcapsules to a predetermined temperature so that they foam, expand, and apply pressure to a carbon or fiberglass composite.

171.   On information and belief, Boeing uses the '282 Patent, the '892 Patent, and the '027 Patent to manufacture carbon-fiber composite parts for the '584 Accused Products.

172.   Boeing's decision to secure patents that track the patent-at-issue reflects the significance of these methods to its most advanced aircraft.

*'584 Patent – Claim 11 Element (h)*

173.   The '584 Accused Products utilize a method of allowing said carbon or fiberglass composite to cure at a second temperature that is at least equal to said predetermined first temperature, and while said resulting pressure is being applied to said carbon or fiberglass composite.

174.    Boeing states that major parts used in the '584 Accused Products, including the 787 Dreamliner, are formed "on a tool and cured in a large autoclave prior to assembly." **Exhibit R**.[20]

175.    This includes the fuselage, which is "wrapped and placed in Boeing's autoclave for curing." **Exhibit O**.[21]

176.    And Boeing's own technical publication explains that the cure cycle uses an autoclave "applying heat and pressure to the part." **Exhibit Q** at 27.[22] This is akin to placing the aircraft parts inside of an oversized industrial oven "to cure the resin,"[23] which "hardens the plastic and creates a solid composite structure," as illustrated below.

Source: Real Engineering, *How the Boeing 787 Works*, https://www.youtube.com/watch?v=z_PlyQAWT4g&t=76s [https://perma.cc/VA75-ZLD3] (4:09 – 4:20) (last visited November 7, 2025).

---

[20] Boeing, *Boeing Composite Manufacturing Center Begins Fabricating 787 Vertical Fin*, https://boeing.mediaroom.com/2006-09-19-Boeing-Composite-Manufacturing-Center-Begins-Fabricating-787-Vertical-Fin [https://perma.cc/3JD8-U9JH] (last visited November 7, 2025).

[21] Boeing, *First 787 Composite Fuselage Section*, https://secure.boeingimages.com/archive/First-787-Composite-Fuselage-Section-2F3XC5QEBM1.html [https://perma.cc/39PC-MGTD] (last visited November 7, 2025).

[22] Boeing, *Innovation Quarterly*, https://www.boeing.com/content/dam/boeing/boeingdotcom/features/innovation-quarterly/archive/IQ_2019_February_Winter_FINAL.pdf [https://perma.cc/V8D4-66NA] (last visited November 7, 2025).

[23] Boeing even highlights the output of this process, noting that it recovers and recycles "excess **cured** and uncured carbon fiber" from production for reuse in other parts and products. **Exhibit L** (Boeing, *Airplane and Carbon Fiber Recycling*, https://www.boeing.com/content/dam/boeing/boeingdotcom/principles/esg/sustainability/fact-sheet-airplane-composite-recycling_06-2020.pdf [https://perma.cc/K688-DUMG] (last visited November 7, 2025)).



177.    Likewise, in the '282 Patent, Boeing claimed exclusive rights over a method of manufacturing a composite workpiece by "curing the composite workpiece while the composite workpiece is at a temperature that is at least the predetermined first temperature and while at least the predetermined pressure is applied to the composite workpiece." **Exhibit B** at Column 33.

178.    In the '892 Patent, Boeing claimed exclusive rights over a method of manufacturing a composite workpiece by "curing the composite workpiece while the resulting pressure is applied to the workpiece supported on the rigid form." **Exhibit C** at Column 29.

179.    And in the '027 Patent, Boeing claimed exclusive rights over a method of manufacturing a first composite that "cur[es] the composite workpiece assembly while the plurality of expanded pellets remain discrete from one another in the cavity" and "heat[s] the plurality of unexpanded pellets from a first temperature to a second temperature higher than the first temperature to expand the plurality of unexpanded pellets to produce a predetermined pressure against the inner surface of the workpiece assembly." **Exhibit D** at Column 33.

180.    Each of these Boeing patents thus parallels element (h) of Claim 11 of the '584 Patent by curing at temperature under pressure.

181.    On information and belief, Boeing uses the '282 Patent, the '892 Patent, and the '027 Patent to manufacture carbon-fiber composite parts for the '584 Accused Products.

182.    Boeing's decision to secure patents that track the patent-at-issue reflects the significance of these methods to its most advanced aircraft.

183.    The similarities between the '584 Patent and Boeing's '282 Patent, '892 Patent, and '027 Patent are evident when comparing their respective claim language.

184.    The chart below, which compares the language of the '584 Patent's claim 11 to the language of the '282 Patent's claim 1, highlights these parallels.

| '584 Patent | Boeing '282 Patent (*see also* '892 Patent and '027 Patent) |
|---|---|
| 11. A method of manufacturing a shaped fiber composite part, comprising: | 1. A method of manufacturing a composite workpiece, the method comprising: |
| (a) supplying thermally expandable foamable microcapsules, said microcapsules encapsulating a foaming agent; | [1.] positioning a heat-generating element and a plurality of thermally expandable pellets proximate to an uncured composite workpiece, the heat-generating element being capable of undergoing an exothermic chemical reaction or an exothermic physical reaction when triggered, the plurality of thermally expandable pellets being configured to soften and undergo volumetric expansion by foaming when heated to a predetermined first temperature; |
| (b) supplying an uncured carbon or fiberglass composite having a curing temperature; | [1.] . . . proximate to an uncured composite workpiece . . . |
| (c) supplying a rigid constraining mold; | [1.] constraining a volume around the uncured composite workpiece; |
| (d) placing said uncured carbon or fiberglass composite against a wall of said constraining mold; | 13. The method of claim 1, wherein constraining is performed using a constraining container, and wherein thermally expandable pellets of the plurality of thermally expandable pellets are in direct contact with a wall of the constraining container after the plurality of thermally expandable pellets have undergone the volumetric expansion by foaming. |

| '584 Patent | Boeing '282 Patent<br>(*see also* '892 Patent and '027 Patent) |
|---|---|
| (e) adding said foamable microcapsules to an internal volume of said constraining mold proximate to said uncured carbon or fiberglass composite, said foamable microcapsules being configured to undergo volumetric expansion by foaming only when heated to a predetermined first temperature; | [1.] triggering the heat-generating element to produce the exothermic chemical reaction or the exothermic physical reaction so that a temperature of the uncured composite workpiece and the plurality of thermally expandable pellets is raised to at least the predetermined first temperature, . . . |
| (f) closing said constraining mold to create a sealed pressure vessel; | 13. The method of claim 1, wherein constraining is performed using a constraining container, and wherein thermally expandable pellets of the plurality of thermally expandable pellets are in direct contact with a wall of the constraining container after the plurality of thermally expandable pellets have undergone the volumetric expansion by foaming.[24] |
| (g) causing a plurality of said foamable microcapsules to expand by heating said foamable microcapsules to above or at the predetermined first temperature, so that a volumetric expansion by foaming of the foamable microcapsules creates a resulting pressure inside said sealed pressure vessel to said carbon or fiberglass composite; and | [1.] triggering the heat-generating element to produce the exothermic chemical reaction or the exothermic physical reaction so that a temperature of the uncured composite workpiece and the plurality of thermally expandable pellets is raised to at least the predetermined first temperature, and so that the plurality of thermally expandable pellets undergoes the volumetric expansion by foaming to apply at least a predetermined pressure to the composite workpiece; and |
| (h) allowing said carbon or fiberglass composite to cure at a second temperature that is at least equal to said predetermined first temperature, and while said resulting pressure is being applied to said carbon or fiberglass composite. | [1.] curing the composite workpiece while the composite workpiece is at a temperature that is at least the predetermined first temperature and while at least the predetermined pressure is applied to the composite workpiece. |

185.    Boeing has thus directly infringed, and continues to directly infringe, each element

of Claim 11 by making, using, selling, or offering for sale in the United States, and/or importing

---

[24] *See* **Exhibit B** at Column 15 (noting that the constraining container "is configured so as to be capable of being sealed, and to withstand internal pressure").

into the United States without authorization, one or more Accused Products that practice at least Claim 11 of the '584 Patent.

186.    In addition, Boeing's ongoing infringement of the '584 Patent is willful.

187.    As detailed herein, Boeing has notice of the '584 Patent and its infringement of it.

188.    Nevertheless, without authorization, Boeing deliberately continues to infringe the '584 Patent and also encourages others to infringe the '584 Patent, including by selling and/or using '584 Accused Products in the United States.

189.    Boeing's acts of infringement have caused damage to Xene, and Xene is entitled to recover from Boeing the damages it has sustained as a result of such wrongful acts in an amount to be proven at trial.

## COUNT 2 – INFRINGEMENT OF U.S. PATENT NO. 11,806,584
## UNDER 35 U.S.C. § 271(b)

190.    Xene repeats and incorporates by reference each preceding paragraph as if fully set forth herein, and further states:

191.    Under 35 U.S.C. § 271(b), "[w]hoever actively induces infringement of a patent shall be liable as an infringer."

192.    The Boeing Company is the parent company to all Boeing entities and affiliates.

193.    The Boeing Company directs the operations of all Boeing entities and affiliates, as described in its 2024 Form 10-K.

194.    On information and belief, The Boeing Company has knowledge of the '584 Patent.

195.    For example, The Boeing Company's '892 Patent references "expandable thermoplastic microspheres sold . . . under the proprietary name EXPANCEL" as being "[s]uitable microspheres." **Exhibit C** at Column 13; *see* **Exhibit D** at Column 10 ("Suitable microspheres can

include the expandable thermoplastic microspheres sold . . . under the proprietary name EXPANCEL.").

196.    The Boeing Company's affiliates, and those affiliates' executives, are targets of a criminal investigation commenced in South Korea on or around September 2023 concerning the South Korean counterpart/version of the '584 Patent. **Exhibit S**.[25] The investigation followed an infringement lawsuit filed by Xene's predecessor in interest, Xene Corporation, against Nouryon B.V. ("Nouryon"), the manufacturer of EXPANCEL microcapsules, and its affiliates. *Id.* Because of the South Korea criminal investigation, The Boeing Company has had knowledge of the '584 Patent no later than September 2023.

197.    The Boeing Company is also a defendant in a criminal proceeding pending in Portugal and initiated in October 2023 concerning the Portuguese counterpart/version of the '584 Patent. **Exhibit T**. As with the South Korean criminal investigation, the Portugal proceeding followed an infringement lawsuit filed by Xene Corporation against Nouryon, the manufacturer of EXPANCEL microcapsules. **Exhibit U**.[26] The Portugal criminal proceeding further demonstrates that The Boeing Company has had knowledge of the '584 Patent since no later than Fall 2023.

198.    On information and belief, The Boeing Company purchases at least some of its microcapsules used in making its products from an affiliate of the Nouryon companies.

---

[25] Law Firm Newswire, *Airbus Kora, Boeing Korea Execs Under Criminal Investigation for Violations of Penal Code; Could Fave 7 Years Imprisonment*, https://lawfirmnewswire.com/2023/09/airbus-korea-boeing-korea-execs-under-criminal-investigation-for-violations-of-penal-code-could-face-7-years-imprisonment/ [https://perma.cc/9U69-EH57] (last visited November 7, 2025).

[26] Legal Newsire, *Nouryon, Akzo Nobel Under Criminal Investigation for Industrial Property Violations; Execs Could Face 3 Years Imprisonment and Recovery of Profits from 2018 Transfer of Business*, https://icrowdlegal.com/nouryon-akzo-nobel-under-criminal-investigation-for-industrial-property-violations-execs-could-face-3-years-imprisonment-and-recovery-of-profits-from-2018-transfer-of-business/ [https://perma.cc/W7KS-V8GS] (last visited November 7, 2025).

199.    The Nouryon companies are currently involved in two patent lawsuits concerning Xene's predecessor in interest, Xene Corporation, pending in the Eastern District of New York and Delaware.

200.    The two pending lawsuits between Xene Corporation and Nouryon concern the parent and grandparent patents of the '584 Patent.

201.    Because of these lawsuits, on information and belief, The Boeing Company was made aware of the '584 Patent and its parent and grandparent patents.

202.    Upon information and belief, an employee of an affiliate of the Nouryon companies made The Boeing Company aware of at least one lawsuit between Xene Corporation and the Nouryon companies.

203.    Despite The Boeing Company's knowledge of the '584 Patent, The Boeing Company continued to infringe the '584 Patent either by itself, or by directing and inducing its affiliates to continue to practice the methods claimed in the '584 Patent.

204.    Thus, The Boeing Company has induced infringement of the '584 Patent.

## COUNT 3 – INFRINGEMENT OF U.S. PATENT NO. 11,806,584 UNDER 35 U.S.C. § 271(g)

205.    Xene repeats and incorporates by reference each preceding paragraph as if fully set forth herein, and further states:

206.    Under 35 U.S.C. § 271(g), "[w]hoever without authority . . . offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer . . . ."

207.    Boeing has sold and continues to sell the Boeing 787 Dreamliner for use in Virginia, including at Ronald Reagan Washington National Airport in Arlington, Virginia, and Washington Dulles International Airport in Dulles, Virginia.

208.    Unsurprisingly, Boeing has proclaimed that it has a "foundation here in Northern Virginia" and that its headquarters in Alexandria, Virginia are "close to Boeing's global customers and stakeholders." **Exhibit E**[27]; *see* **Exhibit F**[28] (noting that Boeing calls "Virginia home").

209.    Specifically, Boeing uses, offers to sell, or sells within this District aircraft made by a process covered by the asserted patent.

210.    For example, Boeing flew its 787 Dreamliner into Ronald Reagan Washington National Airport in Arlington, Virginia as part of its international "Dream Tour."

Source: Boeing, *Boeing 787 and Dream Tour Land in D.C.*, https://www.youtube.com/watch?v=fWzpw9x-jHw [https://perma.cc/YG9B-3NTR] (last visited November 7, 2025).

---

[27] Boeing, *Boeing Names Northern Virginia Office Its Global Headquarters; Establishes Research & Technology Hub*, https://boeing.mediaroom.com/2022-05-05-Boeing-Names-Northern-Virginia-Office-Its-Global-Headquarters-Establishes-Research-Technology-Hub [https://perma.cc/ZX3E-5J9D ] (last visited November 7, 2025).

[28] Governor of Virginia, *Governor Glenn Youngkin Statement on Boeing's Decision to Headquarter in Virginia*, https://www.governor.virginia.gov/newsroom/news-releases/2022/may/name-932058-en.html [https://perma.cc/7XTE-X3ZZ] (last visited November 7, 2025).



211.    This event was not merely ceremonial; it was a targeted marketing effort aimed at potential customers and stakeholders. **Exhibit G**.[29]

212.    Boeing's own press materials described the stop as "dramatic," "different," and a "treat," and noted the presence of numerous VIPs, including ambassadors, members of Congress, and then-Secretary of Transportation Ray LaHood. *See* Boeing, *Boeing 787 and Dream Tour Land in D.C.*, https://www.youtube.com/watch?v=fWzpw9x-jHw [https://perma.cc/YG9B-3NTR] (last visited November 7, 2025).

213.    During this marketing visit, Boeing's then-CEO Jim Albaugh publicly promoted the aircraft as "the first new airplane of the 21st Century," highlighting its "all composite" design— a feature central to the patented process at issue. *See id.* (1:46 – 2:02) (last visited November 7, 2025); *see also* Long Haul by Simple Flying, *From Start to Finish: How the Boeing 787 Is Made*,

---

[29]    Boeing, *Boeing Announces Sixth Leg of 787 Dream Tour*, https://boeing.mediaroom.com/2012-04-11-Boeing-Announces-Sixth-Leg-of-787-Dream-Tour [https://perma.cc/NM5N-DB4V ] (last visited November 7, 2025).

https://www.youtube.com/watch?v=CDC0Cd8DP-c [https://perma.cc/Y9MB-VEHD] (describing the "Dream Tour" as being part of an "ambitious global marketing tour") (3:11 – 3:26) (last visited November 7, 2025); Boeing, *Dream Tour Preview*, https://www.youtube.com/watch?v=IYWHPKBSbOc [https://perma.cc/8YX6-CRMG] (noting that the Dream Tour allowed "customers and media" to "get up close and personal with the airplane") (0:13 – 0:25) (last visited November 7, 2025); Boeing, *787 Dream Tour begins in Beijing*, https://www.youtube.com/watch?v=BgA5rdVJr1M [https://perma.cc/XRW8-583G] (stating that, during the Dream Tour, the 787 Dreamliner is "in a marketing configuration" and allowed Boeing to "talk to customers") (1:04 – 1:15) (last visited November 7, 2025).

214.    Thus, The Boeing Company offers to sell, sells, or uses within the Eastern District of Virginia a product which is made by a process patented in the United States.

## COUNT 4 –WILLFUL INFRINGEMENT OF U.S. PATENT NO. 11,806,584 UNDER 35 U.S.C. § 284

215.    Xene repeats and incorporates by reference each preceding paragraph as if fully set forth herein, and further states:

216.    Under 35 U.S.C. § 284, "the court may increase the damages up to three times the amount found or assessed." One circumstance where the court may award enhanced damages is based on "the subjectively willfulness of a patent infringer, intentional or knowing . . . , without regard to whether his infringement was objectively reckless." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 105 (2016).

217.    On information and belief, The Boeing Company has knowledge of the '584 Patent.

218.    For example, The Boeing Company's '892 Patent references "expandable thermoplastic microspheres sold . . . under the proprietary name EXPANCEL" as being "[s]uitable microspheres." **Exhibit C** at Column 13; *see* **Exhibit D** at Column 10 ("Suitable microspheres can

include the expandable thermoplastic microspheres sold . . . under the proprietary name EXPANCEL.").

219.    The Boeing Company's affiliates, and those affiliates' executives, are targets of a criminal investigation commenced in South Korea on or around September 2023 concerning the South Korean counterpart/version of the '584 Patent. **Exhibit S**.[30] The investigation followed an infringement lawsuit filed by Xene's predecessor in interest, Xene Corporation, against Nouryon B.V. ("Nouryon"), the manufacturer of EXPANCEL microcapsules, and its affiliates. *Id.* Because of the South Korea criminal investigation, The Boeing Company has had knowledge of the '584 Patent no later than September 2023.

220.    The Boeing Company is also a defendant in a criminal proceeding pending in Portugal and initiated in October 2023 concerning the Portuguese counterpart/version of the '584 Patent. **Exhibit T**. As with the South Korean criminal investigation, the Portugal proceeding followed an infringement lawsuit filed by Xene Corporation against Nouryon, the manufacturer of EXPANCEL microcapsules. **Exhibit U**.[31] The Portugal criminal proceeding further demonstrates that The Boeing Company has had knowledge of the '584 Patent since no later than Fall 2023.

221.    On information and belief, The Boeing Company purchases at least some of its microcapsules used in making its products from an affiliate of the Nouryon companies.

---

[30] Law Firm Newswire, *Airbus Kora, Boeing Korea Execs Under Criminal Investigation for Violations of Penal Code; Could Fave 7 Years Imprisonment*, https://lawfirmnewswire.com/2023/09/airbus-korea-boeing-korea-execs-under-criminal-investigation-for-violations-of-penal-code-could-face-7-years-imprisonment/ [https://perma.cc/9U69-EH57] (last visited November 7, 2025).

[31] Legal Newsire, *Nouryon, Akzo Nobel Under Criminal Investigation for Industrial Property Violations; Execs Could Face 3 Years Imprisonment and Recovery of Profits from 2018 Transfer of Business*, https://icrowdlegal.com/nouryon-akzo-nobel-under-criminal-investigation-for-industrial-property-violations-execs-could-face-3-years-imprisonment-and-recovery-of-profits-from-2018-transfer-of-business/ [https://perma.cc/W7KS-V8GS] (last visited November 7, 2025).

222.    The Nouryon companies are currently involved in two patent lawsuits concerning Xene's predecessor in interest Xene Corporation pending in the Eastern District of New York and Delaware.

223.    The two pending lawsuits between Xene Corporation and Nouryon concern the parent and grandparent patents of the '584 Patent.

224.    Because of these lawsuits, on information and belief, The Boeing Company was made aware of the '584 Patent and its parent and grandparent patents.

225.    Upon information and belief, an employee of an affiliate of the Nouryon companies made The Boeing Company aware of at least one lawsuit between Xene Corporation and the Nouryon companies.

226.    Despite The Boeing Company's knowledge of the '584 Patent, The Boeing Company continued to infringe the '584 Patent either by itself, or by directing and inducing its affiliates to continue to practice the methods claimed in the '584 Patent.

227.    The Boeing Company's ongoing infringement of the '584 Patent is willful.

228.    For example, as early as July 5, 2023, The Boeing Company had knowledge of the related '447 Patent (of which the '584 Patent is a continuation of) because Xene Corporation publicly alleged that The Boeing Company was committing acts of infringement by "carry[ing] out the process claimed in the Patents in Suit using microspheres." **Exhibit V** at 4; *see* **Exhibit W** (claim chart showing same).

229.    Thus, The Boeing Company had knowledge of, or was at the very least willfully blind to, the '584 Patent since at least July 5, 2023 (if not earlier).

230.    Additionally, on March 13, 2024, Xene Corporation sent Boeing, through an agent, notice that Boeing was infringing the '584 Patent. Boeing therefore had knowledge of, or was at

the very least willfully blind to, its infringement of the '584 Patent since at least March 13, 2024 (if not earlier). **Exhibit X**.

Dear Robert D,

I am writing to bring to your immediate attention patent infringements related to the following patents owned by our client Xene Corporation (a company based in the United States of America) for a 'Fiber Composite and Process of Manufacture': US11,806,584; US10,500,447; EP2454090; JP6403721; KR101826596;  MX 386641B , CN102612427A.

   Our review and investigation have revealed that your company,

   **Boeing,**

   (including  subsidiaires, distributors, and dealers)

is currently engaging in activities that are in violation of our patent rights using microspheres made by Nouryon Specialty Chemicals B.V. or Akzo Nobel BV, and subsidiaries and/or affiliate companies including under the trade name Expancel or Masterbatch.

231.     The Boeing Company's infringement is particularly egregious given its acknowledgment of the patented method's origins.

232.     In a publicly available marketing video, The Boeing Company describes the composite technology used in the 787 Dreamliner as being "the kind of material commonly used in small consumer products, such as tennis rackets"—a reference to the very application where the patented method was first developed and commercialized.

233.     The video even includes footage of a tennis racket being manufactured, reinforcing the connection between the patented method and the process used to manufacture the carbon-fiber composite parts in Boeing's 787 Dreamliner.

Source: Boeing, *"The Dreamliner" – Boeing Age of Aerospace, Ep. 5*, https://www.youtube.com/watch?v=SLgbOhdmK1I [https://perma.cc/LN3R-A8CU] (12:24 – 12:44) (last visited November 7, 2025).



234. This reflects not only The Boeing Company's awareness of the technology's provenance, but also its understanding of the method's core mechanics—further supporting the inference that The Boeing Company knew, or at minimum was willfully blind to, its infringement of the '584 Patent.

235. Furthermore, as detailed herein, The Boeing Company now has notice of the '584 Patent and its infringement of it.

236. Nevertheless, without authorization, The Boeing Company has continued to infringe the '584 Patent, including by using, offering to sell, or selling aircraft made by a process covered by the '584 Patent.

237. Thus, The Boeing Company has willfully infringed the '584 Patent and continues to do so.

## **DEMAND FOR JURY TRIAL**

238. Plaintiff demands a jury trial on all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Xene prays for judgment as follows:

A.      Declaring that Boeing has directly infringed the '584 Patent either literally or under the doctrine of equivalents;

B.      Declaring that Boeing has willfully infringed and continues to infringe the '584 Patent;

C.      Awarding damages to Xene for such infringement, including enhanced damages pursuant to 35 U.S.C. § 284, pre- and post-judgment interest without any limitation by 35 U.S.C § 287, and going-forward damages through the life of the '584 Patent;

D.      Awarding Xene its attorneys' fees pursuant to 35 U.S.C. § 285 or as otherwise permitted by law;

E.      Awarding all other costs and further relief that the Court deems just and proper.

Date: November 17, 2025

Respectfully submitted,


/s/ *Tara R. Zurawski*

Tara R. Zurawski
Virginia State Bar No. 73602
tzurawski@bdiplaw.com
BUNSOW DE MORY LLP
277 South Washington St., Suite 210, #1088
Alexandria, VA 22314
Telephone: (415) 426-4729 Ext. 7016
Facsimile: (415) 426-4744

Andres C. Healy (*pro hac vice forthcoming*)
Washington State Bar No. 45578
ahealy@susmangodfrey.com
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101

Telephone: (206) 505-3843
Facsimile: (206) 516-3883

Stuart E. Pollack (*pro hac vice forthcoming*)
New York State Bar No. 2952984
spollack@susmangodfrey.com
SUSMAN GODFREY L.L.P.
One Manhattan West
New York, NY 10001
Telephone: (212) 729-2059
Facsimile: (212) 336-8340

Ryan T. Weiss (*pro hac vice forthcoming*)
Texas State Bar No. 24107957
rweiss@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana Street Ste. 5100
Houston, TX 77002
Telephone: (713) 653-7833
Facsimile: (713) 654-6666